FILED/REC'D

2026 JUL 20 P 1: 30

CLERK OF COURT
U.S. DISTRICT COURT
WD OF WI

**IN THE UNITED STATES DISCTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| JOHN K. BOROWSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case Code: |
| | ) |
| CANADIAN NATIONAL RAILWAY, | ) Case No.: |
| WISCONSIN CENTRAL LTD, | ) |
| | ) |
| -and- | ) |
| | ) |
| MR. TERRY L. FIELDS, | ) **26   CV   656   WMC** |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF

### STATEMENT OF THE CASE

Plaintiff, Mr. John K. Borowski ("Mr. Borowski"), hereby submits the forgoing complaint against Canadian National Railway ("CN")-Wisconsin Central LTD (collectively, "WC"), and Mr. Terry L. Fields ("Mr. Fields"), for combined efforts of partaking in retaliatory employment practices in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"); as amended by Section 1521 of the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53.

### PARTIES

1.      Plaintiff, Mr. Borowski, is an adult resident of the State of Wisconsin.

2.      Defendant, CN is a Class 1 railroad who provides railroad service across several portions of the United States and Canada. CN's headquarters is located at 935 de La Gauchetiere Street West, Montreal, Quebec, H3B 2M9, Canada.

1

3. Defendant, WC, is a subsidiary of CN's integrated railroad system that is operated within the State of Wisconsin. WC's primary address is 17641 S. Ashland Ave., Homewood, Illinois 60430.

4. Defendant, Mr. Fields, is an adult resident of the State of Wisconsin whose address is 2126 Setter Drive, Kronenwetter, Wisconsin 54455. At all times relevant hereto, Mr. Fields was employed by WC as a communications field manager, acted within the course and scope of his employment and/or under color of authority conferred by CN, and exercised supervisory authority over Mr. Borowski. Mr. Fields personally participated in, directed, approved, ratified, or otherwise contributed to the retaliatory acts and adverse employment actions alleged herein, which give rise to Mr. Borowski's claims.

## VENUE

5. Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), 1391(b)(1), and 1391(b)(2). A substantial part of the events giving rise to Mr. Borowski's claims occurred within the State of Wisconsin. Some, if not all, retaliatory employment practices, adverse employment actions, and related safety-compliance disputes occurred in part within this district. Mr. Fields resides in Marathon County, and most of his individual decision-making processes and those decisions made while acting on behalf of CN and WC occurred inside Marathon and/or Portage Counties.

## APPLICABLE LAW

6. The Federal Railroad Administration ("FRA") issued FRSA- implementing regulations that require the certification of all signal employees under 49 CFR Part 246. In addition, FRA's Part 219 prohibitions (Subpart B; §219.101-§219.107) places the obligation on every regulated railroad worker to abstain from performing FRA regulated duties if there is any possibility of drug or alcohol impairment.

7. Federal Hours of Service ("HOS") law expressly governs railroad signal employees. Under 49 U.S.C. § 21104, a railroad carrier, together with its officers and agents, may not require or permit a signal employee to remain or go on duty for more than twelve consecutive hours or unless the employee has received at least ten consecutive hours off duty during the prior twenty-four-hour period, except under the limited emergency circumstances authorized by the statute. The statute further provides that time on duty begins when the employee reports for duty and ends

2

when the employee is finally released from duty, and that time spent performing other service for the railroad during a twenty-four-hour period in which the employee is engaged in installing, repairing, or maintaining signal systems constitutes time on duty. In addition, 49 C.F.R. Part 228 requires railroads to maintain accurate HOS records and to comply with FRA reporting, recordkeeping, and electronic recordkeeping requirements, including 49 C.F.R. §§ 228.1, 228.3, 228.7, and 228.207.

8.     Accordingly, Defendants were required to ensure that Mr. Borowski and other covered signal employees were trained, permitted, and required to accurately record all federally regulated duty time, including company-mandated safety-related work and other covered service, and were prohibited from discouraging, altering, minimizing, or retaliating against accurate HOS reporting.

9.     The FRSA, broadly prohibits a railroad carrier, its officers, agents, employees, contractors, and subcontractors from discharging, demoting, suspending, reprimanding, intimidating, restraining, coercing, blacklisting, or otherwise discriminating against a railroad employee, in whole or in part, because the employee engaged in protected safety activity. Such protected activity includes, but is not limited to, providing information or assisting in an investigation concerning conduct the employee reasonably believes violates any federal law, rule, or regulation relating to railroad safety or security; refusing to violate or assist in the violation of any federal railroad safety law, rule, or regulation; accurately reporting HOS; and reporting or attempting to report hazardous safety or security conditions.

10.     FRSA further protects an employee who, acting in good faith and based on a reasonable understanding of applicable FRA requirements, refuses to perform work that would require the employee to violate federal railroad safety law or expose the employee, other railroad workers, or the public to an unsafe or unlawful condition. Accordingly, an employee need not wait for an accident, injury, citation, or formal enforcement action before invoking FRSA protection where the employee's refusal or report is grounded in a good-faith, reasonable belief that the requested work/action would violate FRA requirements or create a hazardous safety condition.

3

## FACTS RELATED TO ALL COUNTS

11.     Upon information and belief, WC is a subsidiary and/or controlled railroad affiliate of CN and operates as part of CN's integrated railroad system in Wisconsin. Although certain payroll records identified WC as the payor of wages, Mr. Borowski was recruited, hired, trained, supervised, uniformed, and held out to the public as a CN employee. His training materials, employment communications, workplace identity, and uniforms bore the CN name and branding. Accordingly, CN and WC acted jointly and/or as integrated railroad entities with respect to Mr. Borowski's employment, and any distinction between CN and WC was administrative, internal, and not material to the terms, conditions, supervision, or control of his employment.

12.     Mr. Borowski was hired as a communications technician with a headquarters in Burlington WI. Mr. Borowski's immediate supervisor was Mr. Fields. The territory of which Mr. Borowski was responsible for extended from Burlington Wisconsin, north to Sussex, Wisconsin. Mr. Borowski's employment began on April 1, 2024.

13.     Prior to Mr. Borowski accepting the position, he emphasized how he resided approximately 60 miles away from Burlington and roughly 32 miles from Sussex. Although Rule 8 of the WC Collective Bargaining Agreement ("CBA") required employees to reside within 30 miles of their territory, Mr. Fields advised it was not a problem. Mr. Fields made known that CN was in desperate need of filling vacancies in that area for some time. Part of this information was exchanged via email on March 25, 2024.

14.     Mr. Borowski entered CN with substantial and relevant railroad experience dating back to 2011 at a prior Class 1 railroad. His background included signal construction, signal maintenance, and service as a signal foreman, where he supervised multiple signal employees across multiple states and was entrusted with coordinating complex, safety-sensitive railroad operations. In that capacity, Mr. Borowski regularly assisted the track department on large-scale track projects, ensured compliance with applicable laws and regulations, monitored on-track safety ("OTS") and HOS requirements, coordinated planned work among multiple departments, and worked with municipalities to protect the public during major railroad projects.

15.     A significant part of Mr. Borowski's duties required direct coordination with the FRA during major railroad projects involving heightened operational and public safety risks. The

4

FRA routinely monitored such projects because mistakes in signal, track, and OTS operations could create immediate dangers not only to railroad employees, but also to motorists, pedestrians, municipalities, and the general public. Mr. Borowski's experience working in that environment demonstrates that he was entrusted with responsibilities requiring technical competence, regulatory awareness, sound judgment, and the ability to perform safely under high-risk conditions.

16.    The training that CN provided to Mr. Borowski at the beginning of his employment was materially deficient and inadequate. FRA regulations require railroads to comply with HOS requirements, maintain accurate records, and provide employees with the training necessary to properly understand, report, and comply with those requirements, including training associated with electronic HOS recordkeeping systems. See, inter alia, 49 C.F.R. Part 228, including 49 C.F.R. § 228.207.

17.    CN failed to provide Mr. Borowski with any HOS training, despite assigning him to safety-sensitive railroad work in which compliance with HOS limitations was essential to employee safety, public safety, and regulatory compliance. Had Mr. Borowski not already possessed prior railroad training and experience, CN's deficient training would have left him unqualified, uninformed, and unsafe. What Mr. Borowski knew regarding HOS compliance came from his prior railroad training and experience, not from CN.

18.    The FRA agreed with Mr. Borowski's opinion as it eventually had inspectors sit in class to observe the training CN provided in Homewood Illinois, finding said training inadequate.

19.    Mr. Borowski attended what CN referred to as training between April 1 through April 14, 2024, excluding weekends. Mr. Borowski sent an email to Mr. Fields on April 6, 2024, asking where he entered his HOS. Mr. Fields never addressed the issue nor provided Mr. Borowski with the answer to his HOS-related question. Mr. Borowski reported to his Burlington headquarters on April 15, 2025. He spent most of the week acquiring a company vehicle and necessary tools. Mr. Borowski then made numerous calls to acquire access to the platform where HOS could finally be entered.

20.    Upon reporting to headquarters, Mr. Borowski was introduced to one employee ("Ty"). Ty had zero previous railroad experience and began his CN service in July 2023. Ty

5

detailed how he was the "lead guy" and Mr. Borowski would report to him. He detailed how he was responsible for covering three separate territories, normally covered by three separate qualified technicians. When asked how he was able to accomplish that safely, Ty responded by "making things happen." Ty was willingly working in violation of CN General Instruction ("GI")[1] with Mr. Fields knowledge and approval. Ty detailed that at least 95 percent of his time at CN was done without any assistance from a qualified technician.

21.     Mr. Borowski specifically observed how Ty was not completing, submitting, or complying with HOS requirements. When Mr. Borowski brought this concern to Mr. Fields attention, he attempted to minimize the issue rather than address it as a serious safety and compliance violation. Ty admitted to obvious HOS related violations including working in excesses of hours or otherwise returning to duty prior to being fully rested. Mr. Borowski advised Mr. Fields about this issue as well.

22.     Mr. Borowski was present when Mr. Fields contacted Ty to inquire about Mr. Borowski's reporting. During that call, Ty admitted that he did not follow HOS requirements, stated that no one had meaningfully trained him on HOS compliance, and further admitted that he would not have been able to cover three separate territories without, at times, violating HOS.[2]

23.     Ty also demonstrated a limited and unsafe understanding of OTS. Mr. Borowski observed Ty foul the track numerous times without proper protection in order to "get things done." Ty would foul and even work on the track without appropriate protection, including relying on Individual Train Detection ("ITD") in low-light conditions and in areas with limited sight distance. When Mr. Borowski asked Ty how he expected to detect an approaching train in the dark, Ty

---

[1] GI-301(k) prohibits any technician from working alone, including the solo completion of tests and entering any tests result into the Signals and Communications Inspection System ("SCIS"), until after completing a one-year probationary period, and Comm Tech 2 training. Until such completion, the employee is considered non-qualified and can only work in the direct supervision of another, fully qualified employee.

Until mid-June 2025, Mr. Borowski was unaware of GI-301(k). He found out after he observed Ty, and another employee ("Brandon"), have access to SCIS while Mr. Borowski was unable to acquire the same access. Per Mr. Fields directive, Ty and Brandon were responsible for completing tests and entering them into SCIS. Mr. Borowski either worked with Ty or Brandon, or at times both. With the exception of maybe a few days, there was never any qualified technician. Mr. Borowski first believed that he was qualified due to his previous experience; however, that was not the case.

Brandon also had zero previous railroad experience and inherited one territory from Ty in or around October 2023. While discussing his inability to acquire SCIS access with another manager, Mr. Borowski was advised that someone must have "pulled some improper strings" to get TY and Brandon immediate access.

[2] Brandon never completed HOS as well. So, Mr. Borowski discuss this with Mr. Fields.

responded that he could see the train's headlights. Mr. Borowski explained that relying on headlights was unsafe and inadequate because headlights can fail, visibility can be limited, and railroad employees cannot substitute shortcuts for required OTS just to get work done. Ty responded that no one had ever told him that his conduct was wrong. Mr. Borowski further explained that when employees work together as a group, ITD is not permissible protection, and ITD should never be used at night or in areas with restricted sight distance. Ty stated that without taking shortcuts, he could not cover all three territories. Mr. Borowski then directed Ty to begin following the applicable safety rules because employees working together could all be held responsible for unsafe and non-compliant conduct.

24. Around mid-May 2024, Mr. Borowski was notified that the FRA had begun to investigate and even heavily cite CN for numerous violations. Ty made a comment that Mr. Fields suggested that Mr. Borowski had something to do with the FRA investigation as it coincided with Mr. Borowski's recent complaining. Ty did follow that up stating Mr. Fields was probably joking.

25. Ty was the only employee in charge ("EIC"). Ty was the only one who provided supervision and training to Brandon, all without Ty being qualified himself.

26. In mid-May while helping Ty and Brandon work with a track gang, Ty was again quick to foul the track without proper OTS, nor checking in as a subgroup, prompting Mr. Borowski to have another stern discussion with Ty. It was at that point that Brandon and another CN employee discussed an event that occurred just after Brandon was hired. At said time, Ty instructed Brandon to work inside a track limit that was controlled by a CN track employee. Ty did not check in, and he and Brandon both fouled the track to perform work. Another employee eventually observed this and demanded they both clear the track. This OTS violation made its way to upper management, but no action was taken.

27. Mr. Borowski questioned Ty how he was able to see that another employee had track protection. Ty explained that right from the beginning CN had provided him access to PDS, the software that allows workers to see train traffic, obtain track protection, and observe others who have track protection in effect. When questioned, Ty admitted that he had no special training prior to being granted access to PDS as an unqualified employee. Mr. Borowski explained that long ago he was required to complete special training to obtain remote authority, what CN refers to as PDS. Ty admitted he had never been trained by any qualified employee and that he never had

7

to call in to obtain or release authority. Mr. Borowski questioned if PDS was down how Ty would obtain or release track authority. Ty replied that he would be unable to.

28.     By mid-June, it became clear that Ty was Mr. Fields go to and that Mr. Fields disliked Brandon immensely. Brandon advised that his sole issue with Mr. Fields stemmed from the fact that unlike Ty, Brandon was unwilling to work every single minute of the day or work unsafely. Mr. Borowski's opinion was that Brandon was a much better employee than TY as Brandon was willing to listen to safety concerns and comply with applicable rules.

29.     On one occasion, Mr. Fields contacted Brandon while he was with Mr. Borowski and Ty outside the office in Burlington. Brandon placed his cell phone on speaker so everyone could hear the hostility. Mr. Fields berated Brandon, asking if Brandon wrote his own work schedule now. When Brandon questioned Mr. Fields about what he meant, Mr. Fields asked, "why you are still home?" Brandon responded by advising Mr. Fields that he was at work and told Mr. Borowski and Ty to say hello. There were many other instances of this general hostility. On July 26, 2025, Brandon bid away as he refused to work under Mr. Fields.[3]

30.     Around the same time, Mr. Borowski became aware of  GI 301(k). This was in addition to FRA rule, codified at 49 C.F.R. Part 246, that requires railroads to establish and administer written programs for the certification of signal employees and prescribes minimum federal safety standards for eligibility, training, testing, qualification, certification, and monitoring of employees who perform signal work. See 49 C.F.R. Part 246, including 49 C.F.R. §§ 246.1, 246.101, 246.119, 246.120, and 246.121.

31.     The purpose of the rule is to ensure that only those employees who meet minimum federal safety standards are allowed to perform covered duties. Mr. Borowski understood this rule to be directly relevant because Ty, Brandon, and another employee ("Jose"), hired on or about June 1, 2024, to replace Brandon, were performing communications and signal-related work despite lacking the training, qualification, and certification safeguards required for safe railroad operations. As Mr. Borowski had taken some time away from the railroad, it appeared that under

---

[3] The stress of the job even eventually affected Ty. Mr. Fields began asking Mr. Borowski if Ty was safe for work. Mr. Borowski responded how Ty would probably take safety seriously if CN stops expecting so much out of him. Ty is working unsafe because he fears that if he fails to keep it all together, he will get terminated.

the new rule and GI 301(k) he was no longer considered qualified. Mr. Borowski then refused to continue.

32.     Mr. Borowski then focused on installing crossing monitors in areas far outside his assigned territory. In doing so, he discovered that communications technicians were installing new equipment inside grade-crossing cabins without ensuring that the work complied with applicable FRA signal and grade-crossing safety requirements. FRA regulations require railroad grade-crossing warning systems to be properly maintained, inspected, tested, and documented; require plans necessary for proper maintenance and testing to be kept at each grade-crossing warning system location and to be legible and correct; require control circuits affecting the safe operation of crossing-warning systems to operate on a fail-safe principle; and require grounds affecting signal systems and crossing-warning systems to be properly identified, tested, and addressed. See, inter alia, 49 C.F.R. Part 234, including 49 C.F.R. §§ 234.201, 234.203, and 234.213, and 49 C.F.R. Part 236, including 49 C.F.R. §§ 236.1, 236.2, and 236.101. Because new equipment could impose a foreign ground or otherwise affect the integrity of the grade-crossing warning system, grounds were required to be checked, tested, and documented before the equipment was placed into service.

33.     Mr. Borowski then began contacting the signal department to verify there were no foreign grounds and perform an operational test on each and every crossing. Prior to Mr. Borowski, that was not being performed after Ty or Brandon worked inside crossing cabins.

34.     Mr. Borowski further observed that crossing-cabin prints and related plans were not being updated to reflect the new equipment, creating a serious safety and compliance issue because employees could not safely maintain, troubleshoot, or test the crossing-warning system using inaccurate or outdated plans. A violation of 49 CFR 49 C.F.R. §§ 236.1, 236.2, and 236.101.

35.     Mr. Fields transmitted an email directive requiring each employee to perform a vehicle safety inspection. Mr. Borowski complied with that directive and, consistent with HOS, began recording the time associated with those required inspections. Mr. Fields alleged that Mr. Borowski's reporting was improper and inconsistent with policy. Thereafter, the circumstances of his employment materially changed, and WC and Mr. Fields escalated a course of intimidation, retaliation, verbal reprimands, heightened scrutiny, and adverse treatment that ultimately culminated in Mr. Borowski's termination for engaging in protected activity.

### Count 1- Violation of FRSA 49 U.S.C. § 20109 Employee Protections

36.     Mr. Borowski hereby repeats the averments set forth in ¶¶ 1-35 as is fully set forth herein.

37.     In July 2025, talk went round that the FRA continued to levy heavy sanctions against CN for OTS, HOS, and other safety-related violations. Comments were made about how some of what the FRA was conducting coincided with Mr. Borowski's recent employment and reporting.

38.     Ty, Jose, and Mr. Borowski advised Mr. Fields that they could no longer perform tests, nor enter any more tests into SCIS, due to GI-301(k) and 49 C.F.R § Part 246. At first, both Ty and Jose agreed with Mr. Borowski. Mr. Fields then contacted BRS General Chairman, Mr. Sherron Cook-Bey, threatening to send everyone home unpaid. Mr. Fields knew that Mr. Borowski was leading the resistance and became hostile and displayed signs of resentment just as he did with Brandon.

39.     At first, Mr. Fields scheduled Ty to complete Comms 2 which made sense as he had almost one year of employment. However, Mr. Fields then abruptly cancelled Ty's training and scheduled Mr. Borowski and Jose for both Comms 1 and Comms 2 training instead. This was done as it's believed that Mr. Fields intimidated Ty into once again covering three territories in violation of the rules, while Jose and Mr. Borowski completed their training. Had Mr. Fields sent Ty first, there was no one willing to violate the rules to cover the three territories.

40.     It's without question, Mr. Fields resented Mr. Borowski as it was quite obvious Mr. Borowski was the one who was trying to ensure that everyone complied with HOS, OTS, and other FRA rules. Mr. Borowski knows this in part via Mr. Fields shrewd comment, "he didn't know he was hiring one of those guys!"

41.     The events that follow reflect how CN and Mr. Fields retaliated, discriminated against, and eventually discharged Mr. Borowski for reporting HOS, OTS, and GI-301(k) related safety violations, as well as for refusing to violate those rules. As part of that retaliation, CN and Mr. Fields then discharged Mr. Borowski for refusing to violate 49 CFR § 219.103.

42.     Mr. Borowski was out of the field and in training between August 19, 2024, through August 30, 2024. Mr. Borowski returned to the field on September 2, 2024. As soon as Mr. Borowski returned to the field, Mr. Fields immediately contacted Mr. Borowski and insinuated that his overtime hours were not matching his GPS records. Mr. Borowski responded that they did. He explained that overtime or not, he's required to perform the required vehicle safety inspection. Mr. Borowski further explained that when he is working outside normal hours, and outside his territory, he includes that in his time keeping and HOS.

43.     Mr. Fields instructed Mr. Borowski not to include his vehicle safety inspections in his HOS. Despite putting in similar overtime for quite some time to work in Illinois, even being thanked by Mr. Fields for Mr. Borowski's willingness to travel, the entire atmosphere changed once Mr. Borowski refused to perform testing as an unqualified employee and enter inaccurate HOS. Now, Mr. Fields advised Mr. Borowski that even when working outside his normal hours he could not include travel time to and from Illinois in his overtime. Mr. Borowski then began refusing to work overtime. As Mr. Borowski resided some 80 miles from Illinois; versus Ty who resided less than 20 minutes away, and Jose who resided inside Illinois, Mr. Borowski was unable to get the same amount of work completed.

44.     Mr. Borowski returned to classroom training from September 9, 2024, through September 20, 2024. On or about September 9, 2024, an employee closely aligned with Mr. Fields parroted the same criticisms and issues that Mr. Fields had raised with Mr. Borowski only days earlier concerning his timekeeping, HOS reporting, vehicle inspections, and refusal to ignore FRA-related safety requirements. That employee admitted that he was paid from the time he left his residence until he returned, but stated that Mr. Borowski was having problems with Mr. Fields because he "went against the system." Mr. Borowski responded that following FRA rules, accurately reporting HOS, and refusing to work in violation of safety regulations should not subject an employee to punishment or retaliation.

45.     The employee then wrote "FRA" on Mr. Borowski's desk name tag, marking him as the employee associated with FRA complaints and safety compliance. Mr. Fields later joked about the incident rather than correcting it, further demonstrating that Mr. Borowski was being singled out and retaliated against because of his protected safety complaints and refusal to violate railroad safety laws.

11

46.     On February 18, 2025, Mr. Borowski was headed to the north end of his territory. He missed a turn and was forced to take a small detour due to traffic. Within 2 minutes of doing so, Mr. Fields called to scold Mr. Borowski for travelling home too early. At that time, there was no way anyone could have believed Mr. Borowski was returning home, versus turning around, as he had not traveled anywhere near his residence and at most went two miles out of his way.

47.     On or about March 26, 2025, Mr. Fields questioned Mr. Borowski, yet again, as to why he was recording time under HOS that began at his residence. Mr. Borowski explained that, in June 2024, Mr. Fields had issued an e-mail directive requiring all employees to perform pre-trip vehicle safety inspections, prior to operating any company vehicle each and every day. Mr. Borowski then recited verbatim Mr. Fields e-mail directive to him, at which point Mr. Fields became agitated. Mr. Borowski further advised Mr. Fields that FRA regulations require company-mandated, safety-related work tasks to be accurately recorded under HOS. In response, rather than addressing the regulatory basis for Mr. Borowski's position, Mr. Fields accused Mr. Borowski of falsifying FRA requirements.

48.     Mr. Fields next harassed Mr. Borowski by asserting that Mr. Borowski was untruthful from the outset regarding the distance between Mr. Borowski's residence and Sussex, Wisconsin. Mr. Fields further stated that, if Mr. Borowski continued to record the time associated with required work activities in his HOS, he would not have sufficient time to complete his assigned work. Mr. Borowski reminded Mr. Fields that, before accepting the position, he had disclosed his residence location and commuting distance, and that Mr. Fields had access to mileage, mapping, and GPS information at all relevant times.

49.     Mr. Borowski further stated that the issue had not been raised until after two material circumstances changed: first, CN had filled territories that had previously been understaffed for an extended period; and second, Mr. Borowski's adherence to HOS, OTS, and other FRA-related safety requirements reduced CN's ability to rely on uncompensated or improperly recorded work time. Mr. Borowski advised Mr. Fields how the sudden objection to a distance he was fully aware of since the beginning of employment was pretextual and was being used to pressure Mr. Borowski to stop accurately reporting HOS.

50.     On or about April 8, 2025, Mr. Fields accused Mr. Borowski of "pencil whipping" test records and challenged the amount of time Mr. Borowski spent performing and documenting

such testing. Mr. Borowski denied the accusation and reminded Mr. Fields that the only individual Mr. Borowski had observed falsifying, shortcutting, or otherwise improperly handling test documentation was Mr. Fields himself or his cronies. Mr. Borowski further advised Mr. Fields that, because of the ongoing hostility, false accusations, and retaliatory scrutiny directed at him, Mr. Borowski had begun contemporaneously documenting nearly all of his work activities. Mr. Borowski stated that if Mr. Fields continued making false and defamatory allegations, Mr. Borowski would contact the FRA, request that the FRA verify that the testing had in fact been performed and provide the FRA with documentation concerning months of prior and ongoing willful FRA violations that Mr. Borowski had witnessed Mr. Fields direct or permit employees to commit.

51.     On or about May 9, 2025, Mr. Fields questioned Mr. Borowski about his whereabouts per GPS. Mr. Borowski advised Mr. Fields that he was where he was supposed to be, doing what he was supposed to be doing. Mr. Fields next stated that Ty had informed him that several pieces of equipment were not removed as he instructed, and that Ty had to go behind Mr. Borowski and disconnect and remove it. Mr. Borowski responded that Ty violated the rules as he performed work on equipment that was directly related to the signal department, and Ty was not a qualified signal employee and had zero training to perform such work. As Mr. Borowski was no longer considered a qualified signal employee, Mr. Borowski advised Mr. Fields he felt uncomfortable violating the rules and he should just get someone from the signal department who is qualified.

52.     Mr. Fields replied stating, "you were formally a signal foreman; why is Ty willing to but you don't feel competent?" Mr. Borowski advised Mr. Fields that Ty oftentimes partakes in extremely risky behavior. Mr. Borowski made it extremely clear that it was not that he did not understand the work, it was because per the rules he was no longer able to perform work that can only be done by a qualified signal employee, which now requires updating certifications. Ty then continued to work on the affected signal equipment throughout Mr. Borowski's territory.

53.     In March 2025, Mr. Borowski cleared a train through his territory over the radio. About 30 seconds later, Mr. Borowski heard the train yell out, Emergency, Emergency, Emergency! As Mr. Borowski had just cleared the train, his heart sunk in his chest. Mr. Borowski

13

found out that shortly after clearing the train, a young girl who could no longer handle the stressors of life had just jumped in front of the train Mr. Borowski had just cleared, ending her life.

54.     Mr. Borowski had experienced similar events before. Despite that, and how he understood it was not at all his fault, that suicide troubled Mr. Borowski in ways he was unable to explain. After speaking with co-workers, friends, and family, Mr. Borowski eventually sought therapy. Mr. Borowski was also facing what was then diagnosed as his wife's ongoing seizure disorder during this same time.

55.     On or about July 10, 2025, Mr. Borowski advised Mr. Fields that he required some time off, explaining that he was proscribed a medication that rendered him unfit for duty under 49 CFR § 219.103. Mr. Borowski was then absent from July 10 through July 18. Operating under the belief that if Mr. Borowski took the medication once at night, enough time would lapse between taking the medication and reporting for duty. Mr. Borowski then worked between July 21 through July 25.

56.     Mr. Borowski requested that Mr. Fields provide him with some type of CN policy regarding medication use. Based upon previous experience, other Class 1 railroads provided literature that outlined numerous prohibited medications, including the amount of time required to lapse prior to reporting for duty. Mr. Fields never provided Mr. Borowski with any such information so Mr. Borowski sought it out himself. The CN policy that Mr. Borowski was able to find off a website was extremely vague and possibly inconsistent with CFR § 219.103.

57.     Mr. Borowski then reached out to the FRA to inquire about his diagnosis, his medication, and how it applied to CFR § 219.103. Mr. Borowski was advised that both his medication and diagnosis would render him unfit for duty unless his physician could certify otherwise. Mr. Borowski's physician was unwilling to provide any such certification.

58.     On July 25, 2025, Mr. Borowski began taking his medication twice daily. Knowing that there was no way he could report for duty, he advised Mr. Fields that he would return the company truck to Burlington in case anyone needed to use it. Mr. Borowski advised Mr. Fields that due to both CFR § 219.103 and CN policy he was unable to report for duty.

59.     On July 28, 2025, Mr. Borowski received verification from Mr. Scott J. Johnson, FRA Part 236 Subject Matter Expert, who advised Mr. Borowski that his understanding of HOS

14

was correct. The completion of all company mandated tasks, including vehicle inspections, were to be reported under HOS. Mr. Borowski then forwarded that email to Mr. Fields and his entire crew.

60.     In addition to the notice that Mr. Fields was provided regarding Mr. Borowski's inability to report for duty pursuant to CFR § 219.103 and CN Policy, Mr. Borowski's wife messaged Mr. Fields on August 1, 2025, to advise him that Mr. Borowski was now hospitalized. Despite Mr. Fields being fully aware of these details, Mr. Fields falsified information to CN that he had no idea why Mr. Borowski was absent and forced resigned Mr. Borowski.

61.     To force Mr. Borowski's resignation, Mr. Fields did not merely falsify material facts; he used CBA Rule 17(I) as a pretextual mechanism to accomplish an adverse employment action that FRSA prohibits. Rule 17(I), by its terms and purpose, applies to employees who are absent without authority for more than three consecutive days. It does not apply to an employee who, before any absence accrued, notified supervision that he was prohibited from performing regulated railroad service because reporting for duty would violate 49 C.F.R. § 219.103 and CN's own fitness-for-duty policy. Mr. Borowski's refusal to report under those circumstances constituted protected activity under FRSA, including a refusal to violate or assist in violating federal railroad safety law, a good-faith effort to comply with FRA drug-and-alcohol safety requirements, and a protected report of a condition that rendered him unfit to safely perform covered railroad duties. By treating that federally required safety refusal as an unauthorized absence, and by supplying CN with false or materially incomplete information to trigger a forced resignation, Mr. Fields and CN discriminated against Mr. Borowski because of protected activity within the meaning of 49 U.S.C. § 20109.

62.     Mr. Borowski was able to establish that Mr. Fields had in fact falsified information to have Mr. Borowski essentially terminated. Mr. Borowski was reinstated. When he contacted Mr. Fields to advise that there was no doubt he was unlawfully retaliated against and was reporting it, Mr. Fields retaliated even further.

63.     Issues arose concerning CN's requested and redundant medical paperwork, which CN required Mr. Borowski's healthcare provider to complete notwithstanding that Mr. Borowski had already advised CN and Mr. Fields that he could not safely or lawfully report for duty. Accordingly, on August 22, 2025, Mr. Borowski requested that Mr. Fields permit him to utilize

15

approximately four weeks of accrued vacation to which he was entitled while the paperwork issue was being resolved. Although Mr. Fields had routinely permitted other employees to take vacation on demand, Mr. Fields denied Mr. Borowski's request and stated that Mr. Borowski "had to be cleared back to work first."

64.     At that point, Mr. Fields affirmatively prohibited Mr. Borowski from utilizing accrued vacation and/or reporting for duty unless and until Mr. Borowski obtained medical clearance to return to service. Mr. Fields response therefore constituted a de facto authorization of Mr. Borowski's continued absence, because from that point forward Mr. Borowski's ability to return to duty was expressly conditioned upon approval by CN's medical department.

65.     On or about August 26, 2025, the same day the paperwork was received, Mr. Borowski forwarded the additional documentation that CN requested be completed to his provider. Mr. Borowski's provider went on vacation around that same time. Mr. Borowski questioned the necessity of the additional paperwork because his absence was required by 49 C.F.R. § 219.103, and he had already provided CN with a copy of his prescription. Mr. Borowski further provided CN with information obtained from FRA Drug and Alcohol Program Specialist, Melissa K. Van Dermeir, confirming that, absent express approval from his physician, Mr. Borowski was prohibited from reporting for duty.

66.     Mr. Borowski contacted CN's FMLA Department to determine whether the paperwork from his healthcare provider was received. Further complicating the matter, CN had not fully completed the portions of the form that CN was required to complete. CN's FMLA Department responded to Mr. Borowski on September 8, 2025, indicating that it had not received the paperwork and requested that Mr. Borowski have his provider submit it.

67.     Mr. Borowski's healthcare provider supplied the requested information shortly thereafter, notwithstanding CN's continuing failure to accurately and completely fill out the portions of the paperwork for which CN was responsible. However, that submission was rendered futile because, while CN's FMLA Department was still working with Mr. Borowski to obtain and process paperwork related to his federally mandated absence under 49 C.F.R. § 219.103, Mr. Fields—while still upset about Mr. Borowski's protected reporting and his refusal to perform work in an unlawful or unsafe manner—denied Mr. Borowski's vacation request in part to force his resignation a second time on September 4, 2025. This occurred even though CN's FMLA

16

Department was continuing to work with Mr. Borowski to obtain paperwork that merely repeated the medication regimen and fitness-for-duty information that had already been provided to CN and Mr. Fields earlier in time.

68.     As a former BRS Union Representative with substantial knowledge and experience concerning the CBA, Mr. Fields knew that Rule 17(I) was available as a vessel of retaliation but could not apply it to Mr. Borowski under the factual and lawful circumstances. So, Mr. Fields willfully fabricated and/or materially omitted facts regarding Mr. Borowski's known medical status, federally required inability to report for duty, and prior request to use accrued vacation. Mr. Fields denied Mr. Borowski's vacation request for the sole purpose of invoking Rule 17(I) as a pretextual mechanism to force resignation. Mr. Fields use of Rule 17(I) was outside its intended purpose, inconsistent with its application to other employees, and constituted retaliatory discrimination in violation of the FRSA.

69.     Mr. Borowski first submitted his claims to OSHA; the required tolling period of 210 days (49 U.S.C. § 20109(d)(3)) expired prior to filing this complaint.

## **PRAYER FOR RELIEF**

1.     For injunctive relief finding that Defendants violated the FRSA and an order requiring the immediate reinstatement of Mr. Borowski.

2.     For monetary damages, which compensate Mr. Borowski for lost wages and related expenses in an amount to be determined at trial.

3.      For punitive damages in the amount of $250,000.00 per Defendant.

Mr. Borowski respectfully requests a trial by jury.

Respectfully Submitted July 20, 2026

Mr. John K. Borowski Jr. (Plaintiff-Pro Se)